**ALPHA TRIAL GROUP, LLP**
RICHARD K. WELSH (State Bar No. 208825)
JEFFREY A. ZUIDEMA (State Bar No. 248057)
10940 Wilshire Blvd., Suite 600
Los Angeles, CA  90024
Telephone:  (310) 562-4550
Email:   rwelsh@atgllp.com
         jzuidema@atgllp.com

Counsel for Plaintiff Southern Natural Resources, LLC

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Southern Natural Resources, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> Nations Energy Solutions, Inc., an Oklahoma Corporation; Bergstrom Renewables, LLC, a Florida limited liability company; and DOES 1-20, inclusive, <br><br> Defendants. | Case No.  **'20 CV2144 TWR AGS** <br><br> **COMPLAINT FOR VIOLATION OF THE DEFEND TRADE SECRETS ACT; BREACHES OF CONTRACTS; & DECLARATORY RELIEF** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff Southern Natural Resources, LLC ("SNR") alleges against defendants Nations Energy Solutions, Inc. ("NES") and Bergstrom Renewables, LLC ("Bergstrom") as follows:

## INTRODUCTION

1. SNR brings this action against NES and Bergstrom for misappropriating SNR's valuable trade secrets and breaching an Asset Purchase Agreement ("APA") that the Parties entered to grant SNR exclusive development rights to potential windfarm projects in several states. Contrary to the APA's plain terms, NES has developed windfarm projects in Iowa and Mississippi, using SNR's confidential and proprietary project assets and trade secrets. After a dispute between NES and SNR arose concerning a project in Missouri not covered by the APA, NES purported to backdate the termination of the APA all the way to 2018, while, in the same communication, purporting to terminate that agreement effective August 2020. Neither position is true, as the APA can be terminated only in accordance with strictly defined terms. By this action, SNR seeks compensation for Defendants' past misappropriation of trade secrets and breaches of the APA and to enjoin their future misconduct.

2. In addition, SNR and Bergstrom simultaneously entered a related Consulting Agreement, under which SNR paid hundreds of thousands of dollars to Bergstrom in exchange for assistance developing windfarms. The Consulting Agreement covers the scope of the APA's exclusive territories – and beyond. Moreover, Bergstrom agreed that any technical data related to the SNR windfarms projects on which Bergstrom worked belonged to SNR. Bergstrom violated SNR's exclusive rights under the Consulting Agreement by working with Bergstrom's affiliate NES to develop windfarms in Iowa and Mississippi using SNR's trade secrets and proprietary information. In doing so, Bergstrom violated federal trade secret law and the Consulting Agreement's exclusivity, confidentiality, non-solicitation, and ownership term. Bergstrom also provided technical data to SNR in

support of a development in Missouri called High Prairie. Yet Bergstrom's affiliate, NES, now contends ownership rights to that precise data and recently sued SNR in St. Louis, Missouri based on an alleged oral "NES Data Contract" that NES purported to memorialize in an *ex parte* email from its inhouse lawyer to an SNR manager in 2018. By this action, SNR seeks to confirm its ownership of that data, damages from Bergstrom for its past trade secret misappropriations and breaches of contract, injunctive relief to stop Bergstrom from further misconduct, and contractual indemnity from Bergstrom for any defense costs or other liabilities arising from NES's baseless "NES Data Contract" lawsuit.

## THE PARTIES

3. Plaintiff Southern Natural Resources, LLC is a Delaware limited liability company.

4. Defendant Nations Energy Solutions, Inc., is an Oklahoma Corporation, with its headquarter office in Mannford, Oklahoma.

5. Defendant Bergstrom Renewables, LLC, is a Florida limited liability company, with its headquarter office in St. Augustine, Florida.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. § 1331, because, pursuant to 18 U.S.C. § 1836(c), "district courts of the United States shall have original jurisdiction of civil actions brought under [the Defend Trade Secrets Act]." This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367(a).

7. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including negotiating the contracts at issue in San Diego, and under Section 7(i) of their APA, each Party agreed it must bring any dispute that arises between the Parties exclusively in the U.S. District Court for the Southern District of California.

## GENERAL ALLEGATIONS

8. Plaintiff SNR and Defendants NES and Bergstrom entered the Asset Purchase Agreement dated December 11, 2013 to develop windfarm Projects in specified states. The APA and its Schedules and Exhibits total 71 pages and leave no detail open for dispute. The Parties understood the importance of having a carefully drafted and validly executed written contract to govern their relationship, as evidenced by the contract terms summarized below.

9. Under Section 3(b)(i) and (ii) of the APA, NES and Bergstrom represented and warranted their representatives had the power and authority to duly and validly execute the APA, and, upon execution by counterparty SNR, the APA would become a fully enforceable contract. Upon execution, the APA and its form agreements became fully integrated contracts containing all the material terms. In Section 7(l) of the APA, the Parties expressly disavow the existence of any prior agreements, understandings, or representations. Under Section 7(b) of the APA, the Parties agree they may not amend or modify the APA unless they secure a writing signed by authorized representatives of each Party, and, under Section 7(h), the Parties agree any waivers must be made in writing to be effective. In sum, the Parties intended the APA, and nothing else, to govern their relationship.

10. Under the APA, NES granted SNR the exclusive right to the Project Assets to afford SNR the exclusive right to develop the Projects in protected territories in Alabama, Florida, Iowa, Mississippi, North Carolina, South Carolina, and part of Texas. The APA includes detailed Schedules of Projects and Project Assets, such as power purchase agreements, wind reports, and environmental reports. The APA includes a form Payout Agreement to govern the payment that SNR must make to NES if SNR achieves the Closing of a Project. The APA also includes a detailed form Joinder Agreement that the Parties must properly execute if they want to add a new Project to the APA.

11. Under the APA, SNR has the right to control the course of the development of any Project, which SNR may continue, suspend, or terminate in its discretion. During the term of the APA, Sections 4(d)(ii) and (iii) prevent NES and Bergstrom from developing any windfarm within a certain radius of the Projects, including ones in Iowa and Mississippi. Sections 4(e)(i) and (ii) also broadly prohibit NES from modifying any agreement related to any Project Asset and from soliciting any proposals, negotiating any contracts, or providing any confidential information to anyone in relation to the development of a Project. Under Sections 6(a) and (b), the Parties define "Confidential Information" to broadly include all non-public information relating to the Projects. Each Party agreed to keep that information confidential and not to disclose any of it to anyone else, except under narrowly specified circumstances.

12. In support of SNR's Project development efforts, Bergstrom also entered the August 1, 2014 Consulting Agreement with SNR, pursuant to which Bergstrom took by way of assignment all rights and duties under the December 11, 2013 Consulting Agreement between SNR and Bergstrom's and NES's affiliate Renewable Labor Corporation. Under the Consulting Agreement, SNR paid Bergstrom hundreds of thousands of dollars for consulting services related to the development of windfarms. In exchange, Bergstrom agreed in Section 5 of the Consulting Agreement the ownership rights to "[a]ll technical data, evaluations, notes, reports and other work product ('Work Product')" belong to SNR alone. In Section 7, Bergstrom represented and warranted that no other contracts created any restrictions on its ability to perform. In Section 9, Bergstrom promised to keep strictly confidential and not use any "confidential and proprietary information," which broadly includes "all reports, data, information, projections, strategies and other information disclosed or made available to Consultant's Team." Bergstrom also promised to return all and not keep copies of any confidential information upon termination of the Consulting Agreement. Bergstrom agreed to restrictive covenants

even broader than those applicable to NES under the APA and conceded injunctive relief would be warranted to stop any breach of them. Finally, in Section 10, Bergstrom agreed to "protect, defend, indemnify and save" SNR from "any and all claims" relating "directly or indirectly" to "the work or Services to be performed by Consultant or subcontractors hereunder."

**NES Breaches and Purports to Terminate the APA**

13. In August 2020, NES purported to unilaterally terminate the APA under Section 2(f)(v) effective immediately. In the same termination letter, NES also stated that the Parties to the APA terminated that agreement in March 2018. NES, however, provided no documentation of the written notice expressly required by Section 2 to substantiate that position. SNR rejected NES's contention that the Parties terminated the APA in March 2018, and, for the reasons summarized below, SNR likewise rejected NES's August 20th termination notice.

14. To begin, Section 2(f)(v) provides a right of termination to NES and SNR at any time after December 12, 2017, provided that the terminating party has not breached any of its representations, warranties, or covenants. NES cannot invoke that termination right because it breached the APA on multiple occasions. Indeed, NES evidently contended that the Parties terminated the APA in March 2018, because NES's breaches date that far back.

15. Specifically, NES has breached the APA by developing Projects in violation of SNR's exclusive development rights. Sections 4(a), 4(b) and 4(d) give SNR the exclusive right to develop the Projects and restrict NES's rights to develop them, including its use of any Project Assets. NES has been trying to develop certain restricted Projects with various third parties using SNR's Project Assets, which undoubtedly explains why SNR purported to backdate the APA termination as if it had done nothing wrong. For example, based on local media reports, NES has moved on the Salt Creek Project and even opened an office in Toledo, Iowa to advance that development. APA Schedule 2 identifies the Salt Creek Project as a

- 6 -
COMPLAINT

1  Project Asset falling under SNR's exclusive development rights. SNR invested
2  between $5 to 6 million in Salt Creek, not to mention countless hours of time, to
3  develop up to a 300-megawatt windfarm. As a result, SNR created an investment
4  grade wind resource plan, which SNR believes that NES is using to develop this
5  project.

6        16.    In the process of breaching SNR's exclusivity rights, SNR believes
7  that NES breached the APA's non-solicitation and confidentiality covenants as
8  well, such as those outlined in Sections 4 and 6. NES could not possibly, for
9  example, have moved forward on the Salt Creek Project without soliciting local
10 support and contracts or without using SNR's Project Assets, such as technical
11 windfarm, environmental, or other trade secret data.

12       17.    Furthermore, SNR employed Bergstrom as Consultant to work on the
13 Salt Creek project and Bergstrom has breached various terms of that agreement. As
14 a trusted Consultant, Bergstrom had access to confidential and trade secret
15 information about Salt Creek, which Bergstrom promised under Section 9 of the
16 Consulting Agreement to keep "strictly confidential." Bergstrom also promised not
17 to move on any Projects in SNR's exclusive territory. Nevertheless, Bergstrom used
18 that confidential and trade secret information belonging to SNR to advance NES's
19 development of Salt Creek, in violation of federal trade secret law, the APA, and
20 the Consulting Agreement.

21       18.    NES and Bergstrom have also breached the APA by actively
22 developing windfarms in Mississippi, which the APA forbids. Bergstrom also
23 breached the Consulting Agreement by participating in those activities. Here, too,
24 NES and Bergstrom used SNR's confidential information and trade secrets to
25 advance their plan to develop wind resources in Mississippi.

26       19.    Despite failing to comply with the APA's most fundamental terms,
27 NES complained in its August 2020 letter purporting to terminate the APA that
28 NES "has never received any compensation from SNR pursuant to the Agreement"

because SNR has not developed any of the Projects. Under Section 4(a), however, NES agreed that SNR controls the course of development of the Projects and may determine in its discretion to continue, suspend, or terminate the development of any Project. What's more, the Parties always understood the possibility that NES would not Close on any Projects. Indeed, in that precise event, termination Section 2(g) would have required SNR to provide a significant termination payment to NES, had NES fully complied with and properly terminated the contract. But because NES breached the APA, SNR need not recognize NES's August 2020 termination notice and, thus, SNR need not pay NES the $150,000 termination payment or transfer any Southern Development Assets to NES. In addition, when NES complains about its compensation, NES ignores the fact that SNR paid its affiliate, Bergstrom, hundreds of thousands of dollars under the Consulting Agreement, which granted SNR the right to any and all data associated with any projects on which Bergstrom worked, such as the High Prairie Project in Missouri.

**NES Files Its Contrived "NES Data Contract" Lawsuit Seeking to Adjudicate the APA's Termination in St. Louis, Missouri**

20.  In an effort to circumvent the APA's forum-selection clause requiring the Parties file any dispute in this Court, NES filed an admittedly unripe lawsuit in state court in St. Louis County, Missouri, claiming that SNR breached the allegedly unwritten "NES Data Contract" and caused $12 million in damages. NES knows that its Missouri lawsuit is premature because it acknowledges in that petition that SNR has no duty to pay NES any money under the alleged contract until SNR transfers the High Prairie windfarm in Missouri to the buyer, Union Electric Company, which does business in Missouri as "Ameren." NES admits the transfer from SNR to Ameren has not occurred. While NES attempts to allege that the lawsuit does not place the Parties' APA at issue, NES alleges in passive voice that "[t]he APA was terminated pursuant to the NES Data Contract." Thus, NES specifically tied the termination of the APA to its alleged "NES Data Contract."

21. No "NES Data Contract" exists. Instead, NES's inhouse counsel purported to record the existence of a contract – supposedly formed at a bar in New Orleans – in a brief email exchange with an officer of SNR. NES's counsel also purported to record the "termination of the NES/SNR-TG APA," contrary to NES's allegation in St. Louis that the APA "is not at issue in this action."

22. In evident recognition of the fact that NES and SNR must sign a writing to change an existing deal or form a binding new deal, NES's counsel closed that same email to SNR's officer by stating the deal terms were "subject to finalizing by a mutually agreeable written agreement." In addition, NES's inhouse counsel knew that SNR had outside legal counsel, Reed Smith, LLP, which NES's counsel failed to copy on this email. NES's counsel should have never directly communicated with SNR's officer purporting to record a contract, let alone used that improper *ex parte* communication as the sole basis of a $12-million claim. Under California Rules of Professional Conduct 2-100, "a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer."

23. In the two-plus years following the improper email from NES's counsel that NES now contends documented a binding oral contract formed in a New Orleans bar, NES and SNR had numerous communications about the terms of this potential High Prairie deal, including whether to add that project to the APA. Indeed, the same NES lawyer exchanged formal draft contracts negotiating the terms of the potential High Prairie contract with SNR's outside counsel. In the end, NES and SNR never signed a contract. And none of the negotiation history between counsel backdated the APA's termination to 2018. Frustrated by these indisputable facts, NES filed a baseless, preemptive lawsuit in St. Louis County, Missouri in part based on the alleged 2018 termination of the APA, in breach of the APA's California forum-selection and choice-of-law clauses.

24. What's more, NES understands that by refusing to recognize SNR's ownership rights in the High Prairie data received from Bergstrom, NES has placed SNR's ability to close its $620-million windfarm build-to-transfer transaction with Ameren in jeopardy. If SNR fails to close the Ameren transaction, then SNR will suffer well over one-hundred million dollars in damages and seek to recover that catastrophic loss here.

## FIRST CAUSE OF ACTION

## Trade Secret Misappropriation Against NES and Bergstrom (18 U.S.C. § 1836)

25. Plaintiff incorporates the allegations of paragraphs 1 through 24.

26. NES and Bergstrom have misappropriated SNR's trade secrets, including its financial, business, scientific, technical, economic, and engineering information. For example, Defendants improperly used SNR's highly confidential wind study data (which SNR gathered over approximately three years by having meteorological towers installed on real property), third-party wind resource assessments, geographic information system (GIS) layouts, feasibility studies, various environmental reports (e.g., on bats and eagles), and interconnection data.

27. SNR has taken reasonable measures to keep that information secret on its secured server and provides this information on only a need-to-know basis to parties who agree to treat the information confidentially.

28. The above information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Wind project investment is fundamentally based on wind data. And companies cannot develop windfarms without the information above. Defendants used SNR's trade secrets to advance their economic interests.

29. As a result of NES's and Bergstrom's misappropriation of SNR's trade secrets, SNR seeks an injunction, actual and exemplary damages, unjust enrichment, and attorneys' fees.

## SECOND CAUSE OF ACTION

### Breach of the APA Against NES and Bergstrom

30. Plaintiff incorporates the allegations of paragraphs 1 through 24.

31. SNR and NES executed a valid and fully enforceable contract, the APA. SNR fully performed or is excused from fully performing all its material obligations under that contract.

32. As detailed above, NES breached the APA's exclusivity provisions, non-solicitation terms, and confidentiality terms. NES has developed projects in SNR's exclusive territory, including, without limitation, SNR's territory in Iowa and Mississippi. In doing so, NES has used SNR's Project Assets, solicited contracts, and disclosed confidential information belonging exclusively to SNR.

33. As a result of NES's breaches of contract, SNR has been damaged in an amount to be proven at trial. The Court should also issue a preliminary and permanent injunction to stop NES's continued breaches of the APA's exclusivity, non-solicitation, and confidentiality terms. In addition, under APA Section 7(e), SNR has the right to recover its attorneys' fees and costs resulting from NES's multiple breaches of contract.

## THIRD CAUSE OF ACTION

### Breach of the Consulting Agreement Against Bergstrom

34. Plaintiff incorporates the allegations of paragraphs 1 through 24.

35. SNR and Bergstrom executed a valid and fully enforceable contract, the Consulting Agreement. SNR fully performed or is excused from fully performing all its material obligations under that contract.

36. As detailed above, Bergstrom breached the Consulting Agreement's exclusivity provisions, non-solicitation terms, confidentiality terms. Bergstrom has

developed projects in SNR's exclusive territory, including, without limitation, SNR's territory in Iowa and Mississippi. In doing so, Bergstrom has used SNR's Project Assets, solicited contracts, and disclosed confidential information belonging exclusively to SNR.

37. As a result of Bergstrom's breaches of contract, SNR has been damaged in an amount to be proven at trial. The Court should also issue a preliminary and permanent injunction to stop Bergstrom's continued breaches of the Consulting Agreement's exclusivity, non-solicitation, and confidentiality terms.

## FOURTH CAUSE OF ACTION

### Quantum Meruit Against NES and Bergstrom

38. Plaintiff incorporates the allegations of paragraphs 1 through 24.

39. Alternatively, if either the APA or Consulting Agreement are unenforceable for any reason, then SNR is entitled to the fair value of the services it performed at the special request of NES and Bergstrom.

40. Specifically, at the request of NES and Bergstrom, SNR developed windfarm projects in various states.

41. NES and Bergstrom have not paid SNR for the fair and reasonable value of the services that SNR provided in developing the windfarm projects at their request.

42. The fair and reasonable value of the services SNR provided exceeds $250,000, the exact amount of which will be proven at trial.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment Against NES and Bergstrom

43. Plaintiff incorporates the allegations of paragraphs 1 through 24.

44. NES and Bergstrom have converted for their own use and benefit assets belonging to SNR that are the subject of this action, including technical data, evaluations, notes, reports and other work product used in the development of

windfarm projects and the hundreds of thousands of dollars that SNR paid in connection with them.

45. NES and Bergstrom will be unjustly enriched to SNR's detriment if they convert and use SNR's assets to develop a windfarm.

46. As a result of their wrongful taking of assets belonging to SNR, SNR has been damaged and NES and Bergstrom have been unjustly enriched, the exact amount of which to be proven at trial.

## SIXTH CAUSE OF ACTION

### Declaratory Relief Against NES and Bergstrom

47. Plaintiff incorporates the allegations of paragraphs 1 through 24.

48. Pursuant to 28 U.S.C 2201, where an actual controversy exists, an interested party may seek a declaration of rights and other legal relations in any court of the United States.

**Under the APA**

49. A dispute has arisen between SNR and NES about whether the Parties terminated the APA. SNR contends the Parties did not terminate the APA and NES contends the Parties terminated it. Thus, SNR seeks a judicial declaration that:

a. NES and SNR did not terminate the APA in 2018, as part of the consideration purportedly exchanged in the negotiation of the alleged "NES Data Contract" or otherwise. Rather, APA Section 2(f)(i) would have required the mutual agreement of the Parties, including Bergstrom.

b. NES did not lawfully terminate the APA unilaterally on August 20, 2020, because NES breached the APA and failed to comply with its exclusivity, non-solicitation, and confidentiality terms. APA Section 2(f)(v) states "the right to terminate this Agreement under Section 2(f)(v) shall not be available to a Party who has breached any of its representations or warranties hereunder or failed to perform its covenants hereunder;"

c. The APA remains in full force and effect and NES has no right to the

   Southern Development Assets under Section 2(g)(ii).

 d. SNR does not owe NES $150,000 termination payment under the APA, because neither the Parties nor NES properly terminated the APA.

### Under the Consulting Agreement

50. A dispute has arisen under the Consulting Agreement, because NES contends that data delivered to SNR by Bergstrom is subject to the alleged "NES Data Contract." SNR contends that it owns that data. Thus, SNR seeks, under the Consulting Agreement, for a judicial declaration that:

 a. Project related data given to SNR by Bergstrom is SNR's property, to which NES has no claim of right.

 b. SNR and NES did not form a contract governing the exchange of the alleged NES data between NES and SNR.

 c. Bergstrom has a duty to defend, indemnify, and hold harmless SNR from all losses related to NES's "NES Data Contract" lawsuit.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1. For an award of general and special damages in excess of $75,000, according to proof at trial;

2. For an award of exemplary damages;

3. For an award of unjust enrichment;

4. For a declaration that NES and SNR did not terminate the APA in 2018, as part of the consideration purportedly exchanged in the negotiation the alleged "NES Data Contract" or otherwise;

5. For a declaration that NES did not lawfully terminate the APA unilaterally on August 20, 2020, because NES breached the APA and failed to comply with its exclusivity, non-solicitation, and confidentiality terms;

6. For a declaration that the APA remains in full force and effect and NES has no right to the Southern Development Assets under Section 2(g)(ii);

7. For a declaration that SNR does not owe NES $150,000 termination payment under the APA, because neither the Parties nor NES properly terminated the APA;

8. For a declaration that the project related data given to SNR by Bergstrom is SNR's property, to which NES has no claim of right;

9. For a declaration that SNR and NES did not form a contract governing the exchange of the alleged NES data between NES and SNR;

10. For a declaration that Bergstrom has a duty to defend, indemnify, and hold harmless SNR from any and all losses related to NES's oral "NES Data Contract" lawsuit;

11. For a preliminary and permanent injunction stopping NES's and Bergstrom's continuing breaches of contract and trade secret misappropriations;

12. For interest according to law;

13. For an award of attorneys' fees and costs; and

14. For any and all other relief the Court deems just and reasonable.

DATED: November 2, 2020        **ALPHA TRIAL GROUP, LLP**

By:_____
JEFFREY A. ZUIDEMA
Counsel for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff requests a jury trial on all issues properly triable to a jury.

DATED: November 2, 2020          **ALPHA TRIAL GROUP, LLP**

By: _____
JEFFREY A. ZUIDEMA
Counsel for Plaintiff